**In re INDUSTRIAL GAS ANTITRUST LITIGATION**

**Robert C. BICHAN, Plaintiff-Appellant,**

v.

**CHEMETRON CORPORATION, a corporation; Allegheny Ludlum Industries, Inc., a corporation; Airco Industrial Gas, a division of Airco, Inc., a corporation; Air Products & Chemicals, Inc., a corporation; Liquid Air Corporation of North America, a corporation; Liquid Air, Inc., a corporation; and Linde Division, a division of Union Carbide Corporation, a corporation, Defendants-Appellees.**

No. 81–2567.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1982.

Decided June 25, 1982.*

---

* Pursuant to Circuit Rule 16, this opinion has been circulated among all judges of this court in regular active service because it creates a conflict between the Seventh and Ninth Circuits. No judge voted to hear the matter *en banc*. Judge Sprecher died on May 15, 1982 without having expressed an opinion on the matter.

Michael W. Rathsack, Chicago, Ill., for plaintiff-appellant.

Henry P. Sailer, Covington & Burling, Washington, D. C., for defendants-appellees.

Before BAUER and POSNER, Circuit Judges, and BARTELS,** Senior District Judge.

BAUER, Circuit Judge.

The issue on appeal is whether Robert C. Bichan, a salaried executive who was terminated from his position as president of Chemetron's Industrial Gas Division and blacklisted by the industrial gas industry, has standing to bring a private treble damage action against his employer under § 4 of the Clayton Act. 15 U.S.C. § 15. The district court held that Bichan could not maintain the action because he was not within the target area of the alleged anticompetitive conduct and had not suffered an "antitrust injury." We affirm.

Bichan was hired to manage Chemetron's Industrial Gas Division. Contrary to established marketing practices, Bichan began competing for customers of other producers and was successful in obtaining an account from a customer who traditionally purchased gas from another producer. In July 1976, shortly after obtaining this account, Bichan was dismissed and, since that time, has been unable to secure similar work in the industry.

Bichan alleges that a conspiracy existed to fix prices, to impose conditions of sales on customers and to allocate customers. He maintains that he was fired and blacklisted because he refused to adhere to these illegal practices. He argues that having lost salary and bonuses as a direct result of his refusal to participate in the conspiracy, he has suffered an "injury in his business or property" within the meaning of § 4 of the Clayton Act. 15 U.S.C. § 15.

** The Honorable John R. Bartels, Senior Judge of the United States District Court for the Eastern District of New York, is sitting by designation.

Analysis of whether Bichan may maintain a treble damages action under § 4 is a two step process. First, we must determine whether Bichan's injury is an "antitrust injury" which is inextricably related to, and caused by, the alleged anticompetitive conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457 (7th Cir. 1981). If we determine that Bichan has suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), we must then decide if Bichan is the proper party to bring this suit. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 *rehearing denied*, 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977).

As the district court judge noted, the question of who may bring a private treble damages action under § 4 is characterized by doctrinal confusion. *In re Uranium Antitrust Litigation*, 473 F.Supp. 393, 401 (N.D.Ill.1979). This confusion has been caused by the exceedingly broad terms in which the treble damages provision is framed. Section 4 of the Clayton Act provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained." 15 U.S.C. § 15. Courts have recognized, however, that the antitrust laws were not intended as a "panacea for all wrongs." *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir.), *cert. denied*, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961), *rehearing denied*, 368 U.S. 972, 82 S.Ct. 437, 7 L.Ed.2d 401 (1962), and that to read § 4's language literally would inevitably lead to excessively complex or numerous suits as well as damage awards unrelated to the social cost of the antitrust violation.[1] *See Havoco of*

1. *See* Page, *Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury*, 47 U.Chi.L.Rev. 467 (1980), where he argues that a plaintiff should not be permitted to re-

*America, Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir. 1980). Thus, this language has been construed to imply restrictions limiting the injured parties who may seek redress under § 4 to those persons whose injury is of a kind the antitrust laws are designed to prevent. *Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1168 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979).

While courts have been in agreement that the right to bring treble damages actions should be limited, they have devised differing tests to identify which parties should be permitted to sue under § 4. To date, at least three tests have been adopted: (1) the target area test; (2) the direct injury test; and (3) the "zone-of-interest" test. All three tests attempt to identify those persons who have suffered an injury which flows from antitrust violations. The target area test focuses on the area affected by the anticompetitive conduct, requiring that the plaintiff be within the area of the economy which was endangered by a breakdown of competition and that plaintiff's injury be a direct result of the lessening of that competition. *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31*, 481 F.2d 122, 128 (9th Cir.), *cert. denied sub nom. Morgan v. Automobile Manufacturing Assoc.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), *rehearing denied*, 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104 (1974). The "zone-of-interest" test, although borrowing language from standing cases decided in the context of administrative law, appears to be similar to the target area test. This test requires that the plaintiff prove a direct and causal relationship between his business or property and the antitrust violations. *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1145 (6th

Cir. 1975). In contrast, the direct injury test, incorporating notions of privity, focuses on the relationship between the injured party and the antitrust violator. *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31*, 481 F.2d 122, 127 (9th Cir.), *cert. denied sub nom. Morgan v. Automobile Manufacturing Assoc.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), *rehearing denied*, 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104 (1974).[2]

■ However, not all persons who have suffered an injury flowing from the antitrust violation have standing to sue under § 4. From the class of injured persons suffering an "antitrust injury" only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action under § 4. *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir. 1975). *Accord, In re Multidistrict Vehicle Air Pollution M. D. L. No. 31*, 481 F.2d 122 (9th Cir.), *cert. denied sub nom. Morgan v. Automobile Manufacturing Assoc.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), *rehearing denied*, 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104 (1974); *In re Uranium Antitrust Litigation*, 473 F.Supp. 393 (N.D.Ill. 1979).

## I

■ We first consider whether Bichan has sustained an "antitrust injury". We conclude he has not.

The parties agree that there is no Seventh Circuit precedent dealing specifically with Bichan's situation, but they differ as to the significance of this fact. Bichan argues that despite the lack of controlling precedent, the cause of his injury, the anti-

---

cover for injury from an antitrust violation that does not foster inefficiency in the marketplace. Page contends that "the predominant goal of antitrust enforcement is the enhancement of competition rather than the subsidization of small and inefficient businesses," *id.* at 468, and believes that treble damages actions will promote economic efficiency, his term for consumer welfare, only if the size of the award approximates the social cost caused by the violation, discounted by the likelihood that the

conduct will be discovered and penalized. *Id.* at 472.

2. *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31*, 481 F.2d 122 (9th Cir.), *cert. denied sub nom. Morgan v. Automobile Manufacturing Assoc.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), *rehearing denied*, 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104 (1974), analyzes each of these tests in detail.

competitive marketing scheme, is precisely the type of restraint of commerce proscribed by the Sherman Act, 15 U.S.C. § 1, and remediable by § 4 of the Clayton Act, 15 U.S.C. § 15. He argues that since the purpose of the antitrust laws is to provide compensation for injury as well as to preserve a competitive market structure, these laws should be interpreted not only to punish conspirators but also to protect persons who induce and encourage competition.

In contrast, appellees (collectively Chemetron), relying on *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), insist that Congress did not intend the antitrust laws to remedy all injuries which might conceivably be traced to anticompetitive conduct. Chemetron argues that the courts have restricted the treble damages remedy to injured parties who are within the target area of the anticompetitive conduct. Defendants assert that the effect of the conspiracy alleged here would be to raise the price of industrial gas, thereby depriving buyers of the lower prices and more advantageous conditions of sale which result from free competition. Thus, Chemetron contends that the only parties within the target area of the alleged conspiracy would be the purchasers of industrial gas and the non-conspiring gas producers. It concludes that Bichan is not within this target area and, thus, he has not suffered the requisite "antitrust injury."

The parties agree that this circuit has adopted the target area test and that if Bichan is to prevail, he must show that he has been a target of the alleged conspiracy. Bichan concedes that in the past, producers, wholesalers, retailers, or consumers have been the parties traditionally found to be targets of anticompetitive conduct. Nevertheless, he argues that § 4 protection should also be extended to executive employees who attempt to encourage competition for two reasons. First, he asserts that extending protection to those who encourage competition is consistent with the goals of the antitrust laws. Second, he contends

that protecting those who encourage competition is the most effective method of eliminating antitrust violations.

In support of his contention that his termination and blacklisting is an "antitrust injury," Bichan relies on *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456, *rehearing denied*, 353 U.S. 931, 77 S.Ct. 716, 1 L.Ed.2d 724 (1957); *Nichols v. Spencer International Press, Inc.*, 371 F.2d 332 (7th Cir. 1967); and *McNulty v. Borden, Inc.*, 474 F.Supp. 1111 (E.D.Pa.1979). Bichan's reliance on these cases is misplaced.[3]

In *Radovich* and *Nichols* the alleged conspiracies were directed at restricting freedom of employment and inhibiting competition in the labor market. *Radovich* involved a boycott to prevent football players from transferring to teams in other leagues; *Nichols* involved an employee no-switching agreement in which publishers agreed not to employ each other's former employees until six months after the termination of the former employment. Since the conspiracies in both cases were intended to restrict competitive conditions in the labor market, the injuries complained of, restriction of employment alternatives, were directly related to the anticompetitive restraints. *See Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1169 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979).

In contrast, Bichan does not stand in the same shoes as the plaintiffs in *Radovich* and *Nichols*. His injury did not result from a lack of competition in the labor market. The conspiracy Bichan charges was aimed at restraining competition in the industrial gas market, causing higher prices for consumers and potential loss of profits for non-conspiring producers. Since the area of the economy endangered by the anticompetitive scheme was not the labor market, Bichan can claim no "antitrust injury".

Further, we agree with the district court that *McNulty* does not support Bichan's claim because its decision is based on faulty

---

**3.** In its opinion the district court also rejected Bichan's reliance on these cases. We agree

with the district court's analysis and, therefore, consider these cases only briefly here.

reasoning. There the court applied the wrong standard to determine whether plaintiff's discharge for objecting to anticompetitive behavior was an "antitrust injury," incorrectly focusing on whether the injury was caused "by reason of" the anticompetitive behavior rather than, as *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), requires, whether the injury resulted from a lessening of competition in the affected industry. We decline to adopt the *McNulty* rationale.[4]

Bichan acknowledges that *Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979), is the leading case in this circuit applying the target area test and concedes that under its rationale he cannot establish an "antitrust injury." He contends, however, that *Lupia* does not apply to his situation. In *Lupia* a supplier granted a five percent rebate to favored retail chain stores but did not offer the same rebate to independent retailers. Plaintiff, an exclusive distributor of the supplier, was forced to absorb the five percent rebate. He then brought a treble damages action against the supplier. The court reasoned that only the independent retailers were in the target area of the anticompetitive action and that the distributor's injury was not an "antitrust injury" but merely "one reflecting harsh treatment of a distributor by a manufacturer." *Id.* at 1169. It held that the distributor's injury was not an "antitrust injury" because if the supplier had absorbed the rebate, rather than passing it on to the distributor, the distributor would not have been injured, "[y]et the anticompetitive nature of [the] policy would not have been affected one iota." *Id.* Bichan claims that, unlike the distributor in *Lupia*, he was actively increasing competition by wooing customers of other producers, and that if he had not

been terminated and blacklisted the anticompetitive conspiracy would not have continued.

Bichan's attempts to distinguish *Lupia* fail. First, we decline to speculate as to what effect Bichan would have had on the market had he not been terminated. More significantly, even assuming *arguendo* that Bichan would have, as he alleges, dramatically reduced anticompetitive activity, appellant's br. at 11, his ability to affirmatively promote competition is totally irrelevant to a determination of whether Bichan himself has sustained an "antitrust injury". The fact remains that the target area test requires that the injuries sustained flow from a lessening of competition in the marketplace. The injuries Bichan has suffered did not derive from the lessening of competition in the industrial gas industry.

We are aware of the recent Ninth Circuit case which holds that a sales manager in a situation very similar to that of Bichan's may bring a private treble damages suit. *Ostrofe v. H. S. Crocker Company, Inc.*, 670 F.2d 1378 (9th Cir. 1982). There, the majority read *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 242 (1977), to interpret § 4 as excluding suits for damages where plaintiff's injury, termination, and blacklisting had nothing to do with the potential anticompetitive conduct, an unlawful merger. The majority noted that to allow suits for unrelated injuries would authorize damages for losses that are of no concern to the antitrust laws and concluded that "*Brunswick* arguably would prevent suit [by an executive employee] if his injury resulted only from unilateral conduct [by the employer] in furtherance of the conspiracy rather than from the elimination of competition in the marketing of [the employee's] services or in the marketing of [the company's product]."

---

4. We also note that *McNulty* is distinguishable on its facts. There, the plaintiff received substantial bonuses based on the volume of sales in his territory. The anticompetitive practices reduced the volume of sales, adversely affecting the amount of these bonuses. Thus, the injury in *McNulty* was, in part, the result of a

lessening of competition in the affected industry. In contrast, as the district court noted, Bichan has not alleged any loss of commissions due to decreased competition in the industrial gas market. *McNulty* does not advance Bichan's position.

*Ostrofe v. H. S. Crocker Company, Inc.*, 670 F.2d 1378, 1387 (9th Cir. 1982).

Having analyzed *Brunswick* as limiting § 4 to suits for damages directly caused by the anticompetitive effect of the antitrust violation, the *Crocker* majority then disregards that analysis. Ignoring *Brunswick*'s clear teachings, it substitutes its own ideas of what the policies underlying the antitrust laws should be and concludes that Congress intended that § 4 protect any injury falling "within the core of Congressional concern underlying the substantive provisions of the antitrust laws allegedly violated." 670 F.2d at 1378. Despite *Brunswick*'s holding to the contrary, the court held that plaintiff had suffered an "antitrust injury" because his asserted loss was of concern to the antitrust laws.

We reject the *Crocker* holding. We believe Judge Kennedy's dissent, maintaining that, under sound antitrust principles, a marketing director whose injury has nothing to do with the alleged anticompetitive conduct of price fixing has not sustained an "antitrust injury," is the more reasoned analysis, and we adopt it here.

We disagree with the majority analysis in *Crocker* for several reasons. First, we read *Brunswick* to hold that § 4 protects only those persons injured as consumers or competitors in a defined market or in a discrete area of the economy. Second, reading *Brunswick* in conjunction with *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, *rehearing denied*, 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977), we are convinced that in fashioning the antitrust laws Congress was concerned with competition, not employee coercion or discharge. Thus, a mere relationship with the anticompetitive scheme is insufficient to bring the injured party within the scope of § 4; only where the injury is directly related to the scheme's anticompetitive effect does § 4 apply.

We decline to usurp the legislative role and rewrite the treble damages provision to extend antitrust protection beyond that dictated by established precedent and Congressional intent. Applying the established

rules of this circuit, we conclude that Bichan has sustained no "antitrust injury" because, while he may have suffered some injury-in-fact, he was not the target of the alleged anticompetitive practices. His injury, therefore, did not result from the defendants' acquisition or exploitation of market power.

## II

However, the presence of an antitrust injury is not the sole determinant of whether Bichan may maintain a treble damages suit. *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539 (5th Cir. 1980), citing *Hawaii v. Standard Oil Corp.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). *See also Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, *rehearing denied*, 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977). Thus, even assuming *arguendo* that we were persuaded to adopt the *Crocker* holding that injury to an employee resulting from a conspirator's effort to implement the anticompetitive practices constitutes an "antitrust injury," we still do not believe Bichan is the proper party to bring a treble damages action because his injury is simply too remote from the alleged illegal conduct.

Unless § 4's phrase "by reason of" is interpreted to require a direct causal link between the antitrust violation and the resulting injury, the courts would be flooded with antitrust litigation. If § 4 were construed "to permit treble damages suits by every creditor, stockholder, employee, subcontractor, or supplier of goods and services that might be affected, the lure of a treble recovery, implemented by the availability of the class suit as facilitated by the amendment of Rule 23 F.R.C.P., would result in an overkill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress." *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Thus, as a general rule, stockholders, employees and creditors of an injured company and suppli-

ers of an injured customer have all been denied recovery because their injuries were too "indirect," "secondary," or "remote." *Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir. 1975) (citations omitted).

While the legislative history to § 4 indicates that the treble damages remedy was intended primarily as a "consumer welfare prescription," *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), designed to protect consumers who are overcharged as the result of price-fixing, the statutory language does not restrict the treble damages remedy solely to consumers. *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). We do believe, however, that the phrase "by reason of" implies a standing requirement, limiting the statute's applicability to those plaintiffs who are efficient enforcers of the antitrust laws. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, *rehearing denied*, 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977); *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). For this reason, a determination of antitrust standing should focus not only on whether there has been an "antitrust injury," but also on whether the particular plaintiff is the appropriate antitrust enforcer. Thus, the conflicting interests of deterrence through private antitrust enforcement and redress for injury must be balanced against the avoidance of excessive treble damages litigation. An appropriate balance is achieved by granting standing only to those who, as consumers or competitors, suffer immediate injuries with respect to their business or property, while excluding persons whose injuries were more indirectly caused by the antitrust conduct. It is this select class of plaintiffs that can impose the deterrent sting of treble damages at the smallest cost of enforcement. Since Bichan is neither a consumer nor a competitor of Chemetron, his injury was indirectly caused by defendants' alleged price-fixing conspiracy and he does not have antitrust standing to maintain this suit.

While Bichan may seek to vindicate his interests in the state courts, he may not maintain a § 4 treble damages action in federal court. We agree with the district court that Bichan has failed to establish that he has sustained an "antitrust injury" or that he has antitrust standing. Accordingly, the judgment of the district court is

AFFIRMED.